## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

LI-LI SUN,

        Plaintiff,

v.                                  Civ.  No. 03-1194 JH/ACT

JOHN POTTER, Postmaster General,
UNITED STATES POSTAL SERVICE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

      This matter comes before the Court on *Defendant's Motion to Dismiss Or, in the Alternative for Summary Judgment* [Doc. No. 29].  At issue in this motion is whether there is a genuine issue of material fact to be resolved at trial as to each of Plaintiff's three claims.  After reviewing the parties' briefs, the exhibits, and the law, the Court concludes that the motion should be granted in part and denied in part.

## LEGAL STANDARD

      Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1990).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc*., 939 F.2d 887, 891 (10th

Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

## FACTS

Many of the facts in this case are disputed.  However, viewed in the light most favorable to the plaintiff, the facts are as follows.

On February 27, 1988, Plaintiff Li-Li Sun ("Sun") began her employment with Defendant as a full time manual distribution clerk.  In August of 1992, Sun experienced pain in both wrists, for which she sought medical treatment.  Her physician stated that Sun could return to work in a sedentary job with the restriction that she not lift more than 10 pounds or occasionally lift or carry objects weighing more than five pounds.[1]  Sun sought worker's compensation for her condition, which was identified as bilateral tendonitis of the arms.  On October 19, 1992, the Department of Labor's Office of Workers' Compensation Programs ("OWCP") notified Sun that her occupational disease claim had been accepted.  At this point, Sun began working 8 hours per shift "casing"[2] mail in a modified rehabilitation case that permitted her to case mail while seated.

Because Sun's was an on-the-job injury, she was classified as a "limited duty" employee.  This is in contrast to a "light duty" employee, who has been injured outside of the workplace.  Although

---

[1]Plaintiff's physician may have made additional finding and imposed additional restrictions. However, the copy of the medical record provided to the Court (Defendant's Ex. D) is largely illegible, and therefore this is all the information that the Court is able to extract from the document.

[2]Although the parties have not explained what "casing" is, the Court has inferred that it involves sorting mail in some manner.

somewhat unclear, it appears from the record that it is preferable for an employee to be classified as "limited duty," because those employees are entitled to certain benefits not given to light duty employees. For example, limited duty employees are entitled to 8 hours of work per day if such work is within their limitation, and they receive a preference over light duty employees. On October 4, 1995, Sun's physician filled out a "Duty Status Report" in which he noted that Sun had suffered cumulative trauma and that her restrictions should be considered permanent.

On March 6, 1998, Dr. Brian Delahoussaye examined Sun and found that she had overall weakness, but no work injury that would lead to any restrictions. He found that Sun had a 0% impairment rating. However, just two weeks later on March 20, 1998, Dr. Richard McKenzie examined Sun and observed that she had pain in her shoulders when she reached overhead and that she experienced wrist pain when doing repetitive casing. Dr. McKenzie opined that her condition had continued from August of 1992 was permanent, and accordingly he renewed Sun's job restrictions. Specifically, he said that Sun could push or pull less than 10 pounds on an intermittent basis, that she could do intermittent grasping and fine manipulation for two hours per day, and over shoulder reaching for two hours per day. Despite these restrictions, Sun continued casing in a rehabilitation case for eight hours per day. There is no clear evidence in the record as to whether this schedule violated Sun's medical restrictions (e.g., there is no testimony regarding the amount of intermittent grasping, fine manipulation, and over-shoulder reaching is involved in casing, although forms filled out by Sun's doctors and supervisors seem to indicate that casing requires eight hours per day of simple grasping), nor is there any evidence that Sun ever objected to this schedule. The record contains no further evidence of Plaintiff's medical history between March of 1998 and October of 2000, although it is clear that Sun's doctors had stated that her medical condition and work

3

restrictions were permanent.  There is also some evidence in the record that one or more supervisor knew that Sun's restrictions were permanent.

In approximately September or October of 2000, the OWCP closed Sun's claim.  Again, it is not clear from the record why the OWCP took that action, although Defendant suggests that it was because Sun had failed to provide the OWCP with up-to-date medical information regarding her condition.  In October of 2000, Sun learned from her supervisors that the OWCP claim had closed. Shortly thereafter, supervisors informed Sun that because her OWCP claim had been closed, she needed to provide Defendant with updated medical information.[3]  Sun provided the requested medical documents on October 24, 2000.  In the meantime, on October 12, 2000, Defendant gave Sun a 30-day <u>light</u> duty assignment casing mail for two hours per day in a modified rehabilitation case.[4] However, Sun refused to sign the offer because she felt that she was being treated unfairly. Defendant sent Sun home.  At some point, however, Sun did come back to work on a modified schedule.  From October of 2000 until May of 2001, Defendant permitted Sun to work only two hours per shift casing mail, despite her requests for eight hours of work per day.

Meanwhile, on October 24, 2000, Sun had provided Defendant with medical documentation

---

[3] There is a factual dispute as to whether or not it was the duty of Sun's supervisor to let her know in advance if and when OWCP required medical documentation regarding her permanent condition.  *See, e.g.*, Plaintiff's Ex. 3 at p. 14; Plaintiff's Ex. 4 at pp. 32-33, 43.  There is also a factual dispute as to whether or not the supervisor actually made such a request. Plaintiff's Ex. 3 at pp. 25-26.  Finally, the record is ambiguous as to how often an employee with medical restrictions must provide Defendant with updated medical information.  Plaintiff's Ex. 4 at pp. 21-22, 42-43.

[4] Defendant essentially has argued that employees who, like Sun, have permanent impairments but whose OWCP claims have closed must necessarily be treated as light duty employees.  However, the record on this issue is unclear, *see* Plaintiff's Ex. 3 at pp. 8-9, and Defendant has failed to provide any documentation to support this position.

and filed a claim with OWCP for recurrence of her disability and for continuation pay.  The medical form, filled out by Dr. Pribyl on that date, states that Sun may do only intermittent lifting of less than ten pounds for up to two to three hours per day, and specifically references the restrictions imposed by Dr. McKenzie on March 20, 1998.  It does not state that Plaintiff could work for only two hours per day.  Two days later, on October 26, 2000, Sun filled out a form entitled "Information for Precomplaint Counseling."  In that document, Sun claimed that she had been mischaracterized as a light duty employee, and that the October 12, 2000 incident in which she was sent home was a result of discrimination against her due to her national origin (Chinese) and her physical disability.  There is also evidence in the record that during the month of October of 2000, there was some degree of confusion among various Postal Service supervisors as to whether Sun was a limited or light duty employee.  On October 30, 2000, Sun refused to sign a light duty request form that would have limited her to two hours of work per day.  On that form, Defendant noted that Sun was unable to perform a wide variety of jobs at the Postal Service.  On December 13, 2000, the Postal Service sent the OWCP a written objection to Sun's recurrence claim.

On January 5, 2001, the OWCP wrote to Sun, notifying her that it had received her Notice of Recurrence of Disability.  The OWCP asked Sun to provide additional medical evidence within 30 days.  On January 11, 2001, Sun filed an EEO complaint of discrimination based on race and national origin, again alleging that she had been improperly sent home on October 12, 2000.

In late January or early February of 2001, Dr. Charles Pribyl wrote a note in which he stated that Sun cannot reach overhead, grasp or manipulate for over two hours per day, and therefore she could only case mail for two hours per day on a rehab case.  Pribyl also stated that "[o]ther times, she can do other things."  The OWCP accepted Sun's recurrence claim and reopened her file on February

16, 2001.  At that point, Sun was eligible to seek compensation from OWCP for any reduction in her hours.  Ultimately, OWCP paid Sun $4,639.25 for hours missed during the period of March 12, 2001 through May 3, 2001.  In addition, the OWCP restored the leave time that Sun had taken during the period October 2000 through March 2001.

On March 12, 2001, the Associate Supervisor of Distribution Operations, Michael Maxon, gave Sun a medical form (known as a "CA-17") upon which her physician was to list her work restrictions.[5]  There is no evidence in the record to explain the delay in providing her with the form, when in fact Sun's OWCP claim had been reopened almost a month earlier.  On March 14, 2001, Sun's physician filled out the CA-17, again limiting her to two hours of simple grasping and reaching above the shoulder per day, five days per week.  Neither this form nor any other document in the record expressly limits the number of consecutive days Sun may work, but rather merely states that she may work no more than five days per week.

On March 26, 2001, Sun submitted the completed CA-17 to Defendant.  Maxon then completed a "limited duty" job offer for a job that was identical to Sun's previous light duty assignment, except that it carried the assigned hours of 10 p.m. until 12:00 a.m.  Sun refused to sign the offer and was sent home.  Sun requested sick leave for the day, which Maxon disapproved.  She then requested leave without pay, which he did approve.  The following day, March 27, 2001, Maxon changed the offer so that Sun would work from 5:50 to 7:50 p.m.  It appears that at some point Sun accepted the assignment and returned to work as a limited duty employee working only two hours per day.

-------

[5]There is a fact dispute over whose responsibility it was to provide Sun with the CA-17, and what was the cause of the delay that resulted in Sun not receiving that form until March 12, 2001, despite the fact that her OWCP claim was reopened on February 16, 2001.

On April 3, 2001, a witness[6] reported that the previous September or October, she/he had heard someone identified only as "Marc" saying that Tom Rooker had said to Arsenio Lovato that the Post Office was hiring Asian people who do not speak English, and that Rooker and Lovato were laughing during this conversation.

Sometime in May of 2001, Sun began working 8-hour shifts that were comprised of two hours of casing mail in a rehabilitation case, and six hours of working as a door monitor or guard. On May 17, 2002, Sun filed a "Report of Hazard, Unsafe Condition, or Practice" regarding the placement of the work desk that she used as a door monitor. The following day, a supervisor moved the desk, although whether or not Sun was satisfied with the new arrangement is a matter of dispute. Sun also complained that she was not trained to be a door monitor, at which point the supervisor provided her with some training.

On September 11, 2002, a piece of equipment collided with Sun's desk where she worked as a door monitor. From the record, it does not appear that Sun was injured during the incident. That evening, Sun filled out a "Report of Hazard, Unsafe Condition, or Practice" regarding the placement of her desk. On September 26, 2002, Sun filled out another "Information for Pre-Complaint Counseling" form in which she claimed that the September 11, 2002 incident was a result of retaliation against her. On October 14, 2002, Sun filed an EEO complaint alleging that the placement of her desk (which resulted in her desk being hit with a piece of equipment) and management's lack of response to her complaints about such placement, were in retaliation for her prior EEO activities.

On January 13, 2003, Plaintiff filled out a third "Information for Pre-Complaint Counseling"

---

[6]Neither party has identified this witness or provided any information regarding his or her position with the Postal Service. Defendant provided a copy of the witness' handwritten statement, but the signature is illegible.

form in which she claimed that the Postal Service retaliated against her when (1) she did not get to see a specific union representative, Charles Trujillo, during the period beginning December 6, 2002 until January 5, 2003[7]; and (2) her work schedule changed six times during the period March 28, 2002 until January 18, 2003.[8]  Sun also complained that at times Defendant failed to accommodate her restrictions by scheduling her to work more than five consecutive days.

Finally, it is undisputed that Sun has no difficulty in walking, seeing, hearing, speaking, breathing, and learning. She can work for up to eight hours per day as long as the work falls within the physical restrictions imposed by her doctor as described above.

On October 15, 2003, Sun filed her Complaint in this Court.  She alleges discrimination on the basis of handicap in violation of the Rehabilitation Act, discrimination on the basis of her national origin in violation of Title VII of the Civil Rights Act of 1964, and retaliation for engaging in activity protected by the civil rights statutes.

## DISCUSSION

## I.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

A threshold issue in this case is whether Sun has properly exhausted her administrative remedies for the claims she is asserting in this case such that this Court has subject matter jurisdiction over those claims.   Federal employees who wish to sue the United States for employment discrimination must exhaust available administrative remedies.  *See Bailey v. United States Postal*

---

[7]It is undisputed that Sun and Trujillo sometimes worked different hours, and that Sun's supervisor gave her the opportunity to talk with other union representatives who were present on the premises during Sun's work hours.

[8]It appears to be undisputed that Defendant changed Sun's schedule six times during the relevant period, but there is a factual dispute as to whether Defendant provided her with adequate notice of those changes.

*Serv.*, 208 F.3d 652, 654 (8th Cir. 2000). Among them is an EEOC regulation, 29 C.F.R. § 1614.105(a)(1), which requires federal employees "to initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."

> **A.      Race/Disability Discrimination**

With regard to Sun's claims for unlawful race and disability discrimination, Defendant argues that the only claim for which Sun has properly exhausted her administrative remedies is her contention that she was unlawfully sent home from work on October 12, 2000.  Defendant contends that Sun has not exhausted her administrative remedies for any other claim, such as (1) the fact that Sun was given only two hours of work per day even after she provided Defendant with her medical documentation on October 24, 2000, and (2) the fact that Defendant delayed processing Sun's OWCP claim for the three and a half month period from October 24, 2000 until February 16, 2001.  The Court disagrees with regard to the former, and agrees as to the latter.

The EEOC forms provided to the Court by the parties only partially support Defendant's argument, as explained below.  On October 26, 2000, Sun submitted an Information for Precomplaint Counseling form alleging that she was offered only two hours of work and then sent home on October 12, 2000 as a result of discrimination against her due to her national origin and physical disability.  Sun took this action well within the 45-day time period, and followed up with her January 11, 2001 EEO complaint of discrimination based on race and national origin for the same incident.  There are no other records before the Court of any administrative action by Sun relating to any claim

for discrimination based on her race or national origin.[9]  However, the fact that Sun was given only two hours of work per day for the next six to seven months even after she provided Defendant with her medical documentation on October 24, 2000 is merely a continuation of the same action initiated by Defendant on October 12, 2000; as explained in greater detail below, it is not a separate and discrete act.  To hold otherwise would virtually to be to require Sun to file a separate EEO form for every day that Defendant provided her with only two hours of work per day, a requirement which the law does not impose.  Therefore, Plaintiff has exhausted her administrative remedies for her claim that Defendant improperly failed to provide her with eight hours of work per day from October 12, 2000 until May of 2001.  However, Defendant's alleged actions in delaying the processing of Sun's OWCP claim does appear to be a separate and discrete action for which she has not exhausted her administrative remedies.

### B.    Retaliation

The administrative documents provided to the Court indicate, and Defendant agrees, that Plaintiff filed timely administrative claims for retaliation as to her assertions that Defendant (1) failed to respond to her concern that her desk was placed in a hazardous area; (2) denied Plaintiff access to the union representative of her choosing; and (3) changed her work schedule two times during the period August 4, 2002 until January 18, 2003.[10]

---

[9] This issue of exhaustion is one that Defendant raised only tangentially in its motion for summary judgment, although it addressed the question at some length in its reply brief.  Plaintiff did not specifically address the issue in her response brief, nor did she seek leave to file a surreply on the issue.

[10] With regard to four separate changes made to Plaintiff's schedule during the period from March 28, 2002 to August 4, 2002, it is undisputed that plaintiff did not raise concerns about those changes with any EEO counselors within 45 days as required by the applicable regulations.

In contrast, Plaintiff did not exhaust her administrative remedies with regard to her assertion that Defendant failed to provide her with eight hours of limited duty work during the period February 16, 2001 (when her OWCP claim was reopened) until May, 2001, because she took no timely administrative action alerting Defendant of her claim that such failure was retaliatory (although she did exhaust her *discrimination* claims as to this event). She also has not exhausted her administrative remedies with regard to four changes to her schedule that took place prior to August 4, 2002.

### C.    Continuing Violation Theory

Several years ago, the Supreme Court addressed the continuing violation theory in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Here in the Tenth Circuit, that case "has effected fundamental changes to the doctrine allowing administratively unexhausted claims in Title VII actions." *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003). Before *Morgan*, the Tenth Circuit had recognized a "narrow exception" to the exhaustion requirement—permitting a claim for incidents not listed in the original administrative charge to be included in the lawsuit if the incidents were "like or reasonably related to the allegations" of the administrative charge. *See Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th Cir. 1997).

That principle has changed in light of *Martinez*, in which the Tenth Circuit stated: "*Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." 347 F.3d at 1210. The Supreme Court reasoned that a plaintiff must exhaust her administrative remedies for each incident because "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and

11

each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114, 122 S.Ct. 2061.

Based on the foregoing, the Court concludes that the continuing violation theory does not apply to those *discrete* acts for which Sun has not contacted an EEO counselor or filed an administrative claim.[11] Thus, for example, Plaintiff has not exhausted her administrative remedies for those schedule changes that took place prior to August 4, 2002, because each change to her schedule was a separate and discrete act by her supervisors. By contrast, Defendant's failure to provide Sun with eight hours of work on October 12, 2000 is not an act that is discrete from its failure to provide her with eight hours of work every day after that for a period of seven months.

## II.    RETALIATION CLAIM

The Rehabilitation Act, like the ADA and Title VII, prohibits retaliation against individuals who make charges under or otherwise exercise rights granted by its provisions. *See* 42 U.S.C. § 12203 (ADA). As explained above, the alleged acts of retaliation that Sun may pursue here include her assertions that Defendant (1) failed to respond to her concern that her desk was placed in a hazardous area; (2) denied Plaintiff access to the union representative of her choosing; and (3) changed her work schedule two times during the period August 4, 2002 until January 18, 2003.

In order to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) her employer took an adverse employment action against her; and (3) a causal connection between the protected activity and the adverse action exists. *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1267 (10th Cir. 2005). A plaintiff may

---

[11] However, those discrete acts still may serve as background evidence in support of Plaintiff's other claims on the motion for summary judgment. *Martinez*, 347 F.3d at 1211.

maintain an action for retaliation even though the conduct forming the basis of her underlying complaint was not adjudged to have violated Title VII.  *Id.*

There is no doubt here that Sun has engaged in protected opposition to discrimination by filing EEO complaints and by seeking pre-complaint counseling.  Therefore, the Court must determine whether Sun has suffered an adverse employment action.

An adverse employment action includes acts that "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).  However, in *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004), the Tenth Circuit held that an adverse employment action is not limited to such acts.  Rather, the court should liberally interpret the second prong of the prima facie case and take a case-by-case approach, examining the "unique factors relevant to the situation at hand."  *Id.* (quoting *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir.1998)).  Nevertheless, the court should not consider "a mere inconvenience or an alteration of job responsibilities" to be an adverse employment action.  *Sanchez*, 164 F.3d at 532.

Sun's first alleged adverse employment action is that Defendant failed to respond to her concern that her desk was placed in a hazardous area.  The Court observes first that it is undisputed that Defendant did respond in some manner to Sun's concern in that a supervisor moved her desk.  There may be a factual dispute as to whether this action was sufficient, but it does not appear that Defendant ignored Sun altogether.  Regardless of the outcome of that factual dispute, disagreements about the position of ones desk relative to other types of office equipment and machinery simply do not rise to the level of "adverse employment actions" contemplated by the Tenth Circuit.  Such

disagreements may be the proper subject of an OSHA claim, a union grievance, or other action under the collective bargaining agreement, but they do not affect the terms of one's employment such as salary, benefits, change of duties or responsibilities, promotions, or reassignment.

Next, Sun has alleged that Defendant denied her access to the union representative of her choosing.   The undisputed evidence in the record shows that Sun did not have access to the specific representative she preferred because they were often not in the workplace at the same time, but that Defendant did make other union representatives available to her.   However, even if Defendant had not permitted Sun to talk to any union representative whatsoever, this issue does not rise to the level of an adverse employment action.

Finally, Sun claims that Defendant changed her work schedule two times during the period August 4, 2002 until January 18, 2003 in retaliation for her protected EEO activities.  With regard to this assertion, the undisputed facts are that Plaintiff's medical restrictions state that she may work five days per week, but there is nothing in the record to support an argument that Sun's doctors ever informed Defendant that she could not work more than five consecutive days during two consecutive work weeks.  Furthermore, the inconvenience that Sun claims to have suffered as a result of these changes to her schedule does not aid her argument.  It is undisputed that Plaintiff's start time changed by only two hours, from 5:30 p.m. to 7:30 p.m., and then back  to 5:30 p.m.  As the Tenth Circuit has observed, a "mere inconvenience" (such as a transfer resulting in an increased commute) does not rise to the level of an adverse employment action. *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998). *See also Pfeil v. Intecom Telecommunications*, 90 F.Supp.2d 742, 751 (N.D. Tex. 2000) ("Changing an employee's work schedule, hours, or increasing an employee's workload are merely administrative decisions and do not constitute [an ultimate employment decision.]" (citing

14

*Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998)).  *Cf. Conatzer v. Med. Prof.*

*Bldg. Servs. Corp.*, 2004 WL 789801 (10th Cir. April 13, 2004) (finding that a temporary change in

work schedule was not an "employment action" such that defendant could not raise

*Burlington/Faragher* defense); *Watts v. Kroger Co.*, 170 F.3d 505 (5th Cir. 1999) (same).

Therefore, because Sun cannot establish that she suffered an adverse employment action for

which she exhausted her administrative remedies, Defendant is entitled to summary judgment on her

retaliation claim.

## III.    DISABILITY DISCRIMINATION CLAIM

The Tenth Circuit has observed that the Rehabilitation Act and the ADA "impose identical

obligations on employers."  *Cisneros v. Wilson*, 226 F.3d 1113, 1124 (10th Cir. 2000), overruled on

other grounds, *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d

866 (2001).  "Because the language of disability used in the ADA mirrors that in the Rehabilitation

Act, we look to cases construing the Rehabilitation Act for guidance when faced with an ADA

challenge," *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1102 (10th Cir. 1999), and vice versa.

*Cummings v. Norton*, 393 F.3d 1186, 1190 n.2 (10th Cir. 2005).  Accordingly, the Court will rely on

authority applying both statutes.[12]

To establish a prima facie case of disability discrimination under the Act, a plaintiff must show

that (1) she is disabled within the meaning of the ADA; (2) she is qualified for her employment

position; and (3) the defendant discriminated against her because of her disability. *See Poindexter v.*

*Atchison, Topeka & Santa Fe Ry. Co.*, 168 F.3d 1228, 1230 (10th Cir. 1999).

### A.    Is Plaintiff Disabled?

_____

[12]The parties have done the same in their briefs.

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  *See also* 29 U.S.C. § 705(9). As explained below, the Court concludes that Plaintiff is disabled as that term is defined by the Act.

### 1.    Impairment

Under subsection (A) of Section 12102(2), a plaintiff must show that an impairment substantially limits at least one major life activity.  *See Bristol v. Bd. of County Comr's of County of Clear Creek*, 281 F.3d 1148, 1158 (10th Cir.), *rev'd in part on other grounds*, 312 F.3d 1213 (10th Cir. 2002) (en banc). This definition contains three elements. First, the plaintiff must have a recognized impairment; second, the plaintiff must identify one or more appropriate major life activities; and third, the plaintiff must show that the impairment substantially limits one or more of those activities.  *Id*. at 1156.  The plaintiff "must articulate with precision the impairment alleged and the major life activity affected by that impairment," *Poindexter*, 168 F.3d at 1232, and the court is to analyze only those activities identified by the plaintiff.  *Id.* at 1231-32.  Whether the plaintiff has an impairment within the meaning of the ADA is a question of law for the court to decide. *See Bristol*, 281 F.3d at 1156-57; *Poindexter*, 168 F.3d at 1230.  Whether the conduct affected is a major life activity for purposes of the Act is also a legal question for the court.  *See Bristol*, 281 F.3d at 1157; *Poindexter*, 168 F.3d at 1230.  However, ascertaining whether the impairment substantially limits the major life activity is a factual question for the jury.  *See Bristol*, 281 F.3d at 1157.

First, the Court concludes that Sun does have a recognized impairment.  It is undisputed that she has bilateral tendonitis of the arms.  The applicable regulation defines an impairment, in pertinent part, to be "Any physiological disorder, or condition ... affecting one or more of the following body

systems: neurological, musculoskeletal ..." 29 C.F.R. 1630.2(h)(1) (2005).  Tendonitis falls within

this definition.  *See Harris v. The Picture People*, No. 03 C 3032, 2004 WL 1898784 at *5 (N.D. Ill.

Aug. 20, 2004).

Next the Court must determine whether Sun has identified one or more major life activity

affected by her tendonitis.  Sun has provided the Court with no evidence that she has any difficulty

caring for herself or performing basic household tasks required in daily life.  Rather, Sun appears to

contend that she is substantially limited in her ability to work, which is undisputedly a major life

activity.  Furthermore, there is evidence in the record that, due to her physical limitations flowing

from bilateral tendonitis, Sun is unable to perform a broad range of jobs at the Postal Service.

Therefore, the Court is left to determine whether Sun's bilateral tendonitis substantially limits

her ability to work.  As noted above, this determination is a factual question for the jury, s*ee Bristol*,

281 F.3d at 1157, although it is appropriate for the Court to examine whether or not Sun has set forth

sufficient evidence to create a question of fact.  This is a close question.  Plaintiff has provided very

little evidence regarding her physical condition and limitations.  Conspicuously absent from the record

is testimony from Sun herself regarding these matters, other than brief deposition testimony in which

she admitted that she is able to walk, see, hear, speak, breath, and learn without difficulty.  However,

the record does contain numerous medical records dating back to 1992 which document Sun's

medical condition and her physical limitations.  These have remained largely consistent over the past

thirteen years, other than one doctor's note in 1998.  Accordingly, it will be up to a jury to determine

whether Sun's impairment substantially limits her in the major life activity of working.

### 2.    Record of Impairment

In the alternative, a plaintiff may show that she has a record of impairment, which Sun has

successfully done here. "To have a record of such an impairment, a plaintiff must have a history of, or been misclassified as having, an impairment that substantially limited a major life activity." *Sorensen v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1087 (10th Cir. 1999). "[T]he record-of-impairment standard is satisfied only if she actually suffered [an impairment] that substantially limited one or more of her major life activities." *Id.* (quoting *Hilburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999)).

Again, based on the medical records before the Court, we conclude that there is at least a fact question as to whether Sun has a record of impairment.

### 3.    Being Regarded As Impaired

The third and final way in which a plaintiff may demonstrate that she is "disabled" within the meaning of the statute is to show that her employer regarded her as impaired. Here, Sun claims that she is disabled under section 12102(2)(C) because Postal Service personnel regarded her as having an impairment that substantially limited the major life activity of working. The "regarded as" prong is "intended to provide a remedy for discrimination based on misperceptions about the abilities of impaired persons." *Krocka v. City of Chicago*, 203 F.3d 507, 513-14 (7th Cir. 2000).

There are two ways in which individuals may fall within this statutory definition: (1) an employer mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) the employer mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1132 (10th Cir. 2003). "In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting

impairment when, in fact, the impairment is not so limiting." *Id.* at 1132-33 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)).

When the major life activity at issue is that of working, a plaintiff must show that she is unable to perform either a class of jobs or a broad range of jobs in various classes. *See Sutton*, 527 U.S. at 491-92, 119 S.Ct. 2139 (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)(3)(i)). A plaintiff asserting she is disabled under subsection (C) must therefore show that her employer regarded her as having an impairment substantially limiting her ability to perform a broad range of jobs, rather than a single position, *see id.* at 491- 92, 119 S.Ct. 2139; *McKenzie v. Dovala*, 242 F.3d 967, 970-72 (10th Cir.2001); *Sorensen*, 194 F.3d at 1088-89, and that the employer's misperception was "based on 'myth, fear, or stereotype,' including concerns regarding safety, insurance, liability, and acceptance by coworkers and the public." *McKenzie*, 242 F.3d at 971.

Plaintiff has failed to meet this standard. There simply is no *evidence* before the Court that the Defendant had any misperception whatsoever regarding Sun's impairment, merely the argument of counsel to that effect. Furthermore, even if there were evidence of a misperception by Defendant, Sun has not set forth any evidence to show that such misperception flowed from 'myth, fear, or stereotype.' Accordingly, Sun cannot show that Defendant regarded her as being impaired.

**B.     Is Plaintiff Otherwise Qualified?**

Having shown that there is a fact question as to whether she is disabled, Sun must next demonstrate that she is otherwise qualified for her position. The parties have not briefed this issue,[13] and therefore there appears to be no dispute that Sun satisfied this prong of the test.

---

[13] There is evidence in the record that while Sun's speed at casing mail is poor, her accuracy is excellent.

19

### C.      Did Defendant Discriminate Against Sun?

Discrimination under the Rehabilitation Act can take two forms: (1) disparate treatment—a claim that an individual with a disability was, due to that disability, treated differently than a non-disabled co-worker, or (2) failure to accommodate—a claim that the employer did not make reasonable accommodations for an individual who is disabled but otherwise qualified.  *See, e.g. Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).  Neither party has clearly articulated the theory that Sun is advancing in this case.  However, Sun has not explicitly argued that she has been treated differently than any non-disabled co-worker.  Furthermore, when she has made comparisons between herself and other USPS employees, those employees also have been injured or disabled.  This leads the Court to understand that Sun is not claiming disparate treatment.  Accordingly, the Court turns only to the claim that Defendant failed to accommodate her disability.

In her response brief, Plaintiff focuses on Defendant's alleged failure to accommodate Sun by sending her home on October 12, 2000 and failing to provide her with eight hours of work over the ensuing seven months.  The Court concludes that there is a fact issue as to this question.  As explained above, the question of whether Sun was "otherwise qualified" is not in dispute, and there is a fact question on the issue of her disability.  Furthermore, on the record currently before the Court, there is a fact question as to whether Defendant was justified in providing Plaintiff with only two hours of work per day beginning October 12, 2000.  Defendant's witnesses have testified that an employee like Sun who has been injured on the job is entitled to eight hours of work.  It is undisputed that Sun was injured on the job.  The only thing that changed in October of 2000 was that the OWCP closed Sun's claim, although there is no competent evidence in the record from the OWCP explaining the reason for that action, only speculation from Defendant's supervisors.

20

Furthermore, it is not clear from the record how the following issues relate to each other: the closure of Sun's OWCP claim, Sun's duty to provide updated medical information to Defendant and OWCP, Sun's classification as a limited duty or light duty employee, and Defendant's duty to provide Sun with reasonable accommodation.  Although there are vague references in the record that might hint at some sort of connection among these issues, Defendant has provided the Court with no testimony or written policies (from either Defendant or OWCP) that might justify Defendant's actions or otherwise shed light on these questions.  These ambiguities reveal the existence of a factual question as to whether Defendant failed to reasonably accommodate Sun.

### D.      Legitimate, Non-Discriminatory Reason and Pretext

Defendant argues that it had a legitimate, non-discriminatory reason for providing her with only two hours of work beginning October 12, 2000: her failure to provide up-to-date medical information.  The Court agrees that, on its face at least, this reason is non-discriminatory.  However, Sun argues, and the Court agrees, that there is a fact issue as to whether this reason was pretextual. Specifically, it is undisputed that Sun provided Defendant with the requested information on October 24, 2000, and yet Defendant still limited her to two hours of work per day until May of 2001.

Accordingly, the Court will deny Defendant's motion for summary judgment on her claim for discrimination under the Rehabilitation Act.

## IV.      RACE DISCRIMINATION CLAIM

In order to survive a motion for summary judgment on this claim, Sun must meet her initial burden to show, through either direct or indirect evidence, that her employer discriminated against her because of her national origin by sending her home on October 12, 2000 and failing to provide her with eight hours of work from that date until May of 2001.  Direct evidence is "proof of an

existing policy which itself constitutes discrimination," *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996), or "oral or written statements on the part of a defendant showing a discriminatory motivation." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). It does not appear that Sun claims to have direct evidence of discrimination in this case.

In the absence of direct evidence, a plaintiff may utilize indirect evidence. In that case, Sun must establish a prima facie case of national origin discrimination by showing (1) that she is a member of a racial minority, (2) that she suffered an adverse employment action, and (3) that similarly situated employees were treated differently. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). At issue here is Defendant's act in providing Sun with only two hours of work from October 12, 2000 until May of 2001.

Once an employee carries her burden of demonstrating a prima facie case, the burden of production shifts to the employer to demonstrate "some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.*; s*ee Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer offers a nondiscriminatory reason, the burden shifts back to the employee to show that there is a genuine dispute of material fact as to whether the employer's reason for the challenged action is pretextual and unworthy of belief. *See Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir. 1994), *overruled on other grounds*, *Martinez v. Potter*, 347 F.3d 1208 (10th Cir.2003).

It appears that neither the first nor the second prong of Plaintiff's prima facie case is at issue here. It is undisputed that Sun is a member of a racial minority. Further, Defendant does not argue that sending Sun home on October 12, 2000 was not an adverse employment action. Accordingly, the question is whether similarly situated employees were treated differently than Sun.

Sun points to approximately thirteen employees who are not Chinese whom she claims are similarly situated and received better treatment than she did.  Defendant, in turn, argues that these employees are not similarly situated, either because they work for a different supervisor (Beverly Schwerdel, Linda Hastings, and Judy Espinosa), they had an open OWCP claim (Gary Fritsch, Gilbert Perea, Lisa Scott, Irene Sanchez, Ruth Vaffaw, Joyell Romero, and Noel Carillo), or had current medical documentation (Gary Fritsch, Gilbert Casias, Irene Sanchez, Judy Espinosa, Ruth Vaffaw, Joyelle Romero, and Noel Carillo).  Similarly, Gilbert Perea has a "permanent modified position," and Lisa Scott and Vincent Cano do not have medical restrictions that prohibit them from doing their "normal bid jobs."[14]

With the exception of Beverly Schwerdel, Linda Hastings, and Judy Espinosa (who worked for different supervisors), based on the information in the record the Court cannot conclude that the remaining employees were not similarly situated to Sun.  As with the disability discrimination claim, this stems in part from the ambiguity surrounding the relationship between the status of an employee's OWCP claim, the employee's duty to provide updated medical information to Defendant and OWCP, the employee's classification as a limited duty or light duty employee, and Defendant's duty to provide an employee with eight hours of work.  However, the Court need not rely solely on this ambiguity.

With regard to employee Kathy Nickerson, it appears that Defendant concedes that she was similarly situated, except to the extent that Defendant argues that Nickerson immediately provided medical documentation upon request, and therefore Defendant was able to quickly embark upon a

---

[14]The parties have not explained the meaning of any of these terms, and the Court will not hazard a guess.

thorough search for work for her.  Defendant contrasts Nickerson with Sun, who it claims delayed in providing medical documentation.  However, there is no evidence in the record as to how quickly Nickerson provided her medical documents to Defendant, although we do know that it took Sun only twelve days to get an appointment with her doctor, obtain the document from him, and to provide it to Defendant.  The record is also unclear as to how quickly Defendant put Nickerson back to work for eight hours per day after receiving her medical documentation as compared to Sun.  Thus, there is a genuine issue of material fact on this issue.

Furthermore, for the same reasons discussed above with regard to the disability discrimination claim, the Court concludes that there is sufficient evidence to support Sun's claim of pretext with regard to Defendant's proffered legitimate, non-discriminatory reason for delaying putting Sun back to work full time.  Accordingly, Defendant's motion for summary judgment will be denied.

**IT IS THEREFORE ORDERED** that:

(1)    *Defendant's Motion to Dismiss Or, in the Alternative for Summary Judgment* [Doc. No. 29] is **GRANTED IN PART** as to Plaintiff's claim for retaliation;

(2)    *Defendant's Motion to Dismiss Or, in the Alternative for Summary Judgment* [Doc. No. 29] is **DENIED IN PART** as to Plaintiff's claims for race discrimination and disability discrimination.


UNITED STATES DISTRICT JUDGE

24